FILED

AUG 0 4 2009

U.S. DISTRICT COURT
CLARKSBURG, WV 26301

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

TERRY L. DEAN,

Plaintiff,

v.
CIVIL ACTION NO. 5:08cv78
(Judge Stamp)

MICHAEL J. ASTRUE, COMMISSIONER OF
SOCIAL SECURITY,

Defendant.

## REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain

judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or

"Defendant") denying his claim for Disability Insurance Benefits ("DIB") under Title II of the Social

Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on cross

Motions for Summary Judgment and has been referred to the undersigned United States Magistrate

Judge for submission of a Report and Recommendation. 28 U.S.C. § 636(b)(1)(B).

### I. Procedural History

Terry L. Dean ("Plaintiff") filed his application for DIB on October 2, 2002, alleging

disability as of January 31, 2002, due to a work-related back injury which occurred that date (114).

Plaintiff's Date Last Insured is December 31, 2002 (R. 76-78), meaning he must prove that he was

disabled on or before that date. 20 CFR section 404.131. His claim was denied at the Initial and

Reconsideration levels (R. 55, 61). Plaintiff requested a hearing, which Administrative Law Judge

("ALJ") Edward J. Banas held on November 12, 2003 (R. 568). Plaintiff, represented by counsel,

testified along with Vocational Expert Larry Bell ("VE"). The ALJ rendered a decision on

November 21, 2003, finding that Plaintiff was not under a "disability," as defined in the Social

Security Act, at any time through his date last insured (R. 40-49).

On August 16, 2005, the Appeals Council granted Plaintiff's request for review, vacated the hearing decision, and remanded the case back to the ALJ for further proceedings (R. 52-54). The Appeals Council Order states that the ALJ's decision "does not reflect an adequate evaluation of the claimant's subjective complaints, an explanation of the weight given to the opinion of an examining source, or an adequate rationale in support of the functional limitations." In particular, the Appeals Council stated the decision "does not adequately consider the full range of the claimant's activities, the various attempts at treatment, or the other criteria in Social Security Ruling 96-7p;" "does not specify the frequency of the need to alternate between siting and standing;" "does not explain the weight give to [psychologist] Levin's functional capacity assessment;" and that "one of the jobs cited by the vocational expert as within the limitations involves constant fingering and handling . . . which indicates a requirement for greater than frequent fine manipulation in that job." The Council directed that upon remand, the ALJ will:

1.     Give consideration to the examining source opinion pursuant to the provisions of 20 CFR 404.1527 and SSR 96-2p and 96-5p and explain the weight given to such opinion evidence;

. . . .

2.     Further evaluate the claimant's subjective complaints and provide rationale in accordance with the disability regulations pertaining to evaluation of symptoms . . . .

3.     Further evaluate the claimant's mental impairment in accordance with the special technique described in 20 CFR 404.1520a, documenting application of the technique in the decision by providing specific findings and appropriate rationale for each of the functional areas described in 20 CFR 404.1520a(c);

2

4.    Give further consideration to the claimant's maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations . . . . [and]

5.    Obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base . . . .

Following remand, a different ALJ, Donald T. McDougall, conducted a second administrative hearing on December 14, 2005 (R. 613). Plaintiff, again represented by counsel, testified, along with VE Larry Bell. On April 5, 2006, ALJ McDougall entered a Decision again finding Plaintiff was not under a "disability," as defined in he Social Security Act, from January 31, 2002, his alleged onset date, through December 31, 2002, his date last insured (R. 29).

Plaintiff requested review of the second decision, which the Appeals Council declined (R. 8), making the ALJ's decision the final decision of the Commissioner. Plaintiff then timely filed his appeal with this Court.

## II. Statement of Facts

Plaintiff was born on April 13, 1954, and was 47 years old on his alleged onset date and 48 years old on his date last insured, both defined as a "younger individual" under 20 CFR 404.1563 (R. 28). He has a GED, considered as a high school education, and past work as a boilermaker (R. 83). He last worked in January 2002.

Because Plaintiff's alleged onset date is January 31, 2002, and his date last insured is December 31, 2002, these are the only relevant dates for this claim. It is undisputed that Plaintiff is not eligible for SSI. The undersigned therefore recites the facts beginning with January 31, 2002, and recites facts after December 31, 2002, as they appear relevant to the time period at issue.

On February 5, 2002, Plaintiff presented to Russell Biundo, M.D. for complaints of back and leg pain (R. 190). He said he had a history of chronic low back pain and left lower leg and extremity radicular pain since a work-related injury in 1993. He had been seen by Dr. Biundo in 1998 for the same pain. His work duties were modified for a period of time. MRI at the time showed no significant structural lesion and he returned to work in November 1998. Plaintiff was since employed as a foreman and boilermaker. For the past three weeks he had had been placed with a crew throwing scaffolding boards, and had worsening back and leg pain since that time. "Overall, this is the same pain but worse. Symptoms, again, are not new." Plaintiff rated his pain as severe and at 10 on a scale of 1-10. His pain was worse with coughing, sneezing and bowel movements, and was described as a constant ache in his mid back in a non dermatomal distribution to the foot. The leg pain was more bothersome than the back pain. The pain was constant and worse with any activities including sitting, standing, walking, driving, and lying on his back or stomach. It was improved with position changes. He was seen by a chiropractor who ordered an MRI. He tried Advil without relief and had no recent workup.

Upon examination, Dr. Biundo found Plaintiff was "in some discomfort but no acute distress." His reflexes were +2 in both legs. Sensation was diminished in a non dermatomal distribution to pinprick. He had giveaway inhibition in the left lower extremity; normal in the right lower extremity. His low back showed Waddell's signs– 4/5 positive; subjective pain behaviors increased; sitting distracted straight leg raising negative; SI joint Fortin's finger test negative; SI tenderness to palpation negative; and supine straight leg raising "too painful for him to try." There were no x-rays or diagnostic studies available.

Dr. Biundo's assessment was chronic low back pain/right lower extremity pain from an

original work related injury in 1993 and exacerbation of symptoms with recent change in jobs over the past two weeks. He prescribed pain medication and light duty for one week then normal duties.

Plaintiff's MRI showed:

1.    Central protrusion of the disc at the level of L4-5 causing moderate to severe spinal canal stenosis. There is also bilateral neural foramina stenosis worse at the left.

2.    Minimal bulging of the disc at the level of L5-S1 causing minimal spinal canal stenosis. There is minimal neural foramina stenosis bilaterally.

(R. 197).

On February 15, 2002, John Danek, D.O. compared Plaintiff's MRI from his old injury with the recent MRI and opined that Plaintiff had a new acute L4-5 herniated nucleus pulposes with encroachment causing stenosis and radicular pain (R. 199). He recommended a consult with a neurosurgeon and gave Defendant a prescription for Vicodin. He stated he had no reason to doubt the presentation of the patient, and suspected there would probably be acute findings on an EMG or nerve conduction study.

On March 15, 2002, Plaintiff underwent a microlumbar discectomy on the left L4-5, performed by neurosurgeon Richard Douglas, M.D. (R. 218). He did well postoperatively and was ambulating and eating well. He was discharged on March 17, 2002.

On March 25, 2002, Dr. Douglas opined that Plaintiff was doing well (R. 306).

On April 10, 2002, Plaintiff presented to Dr. Douglas for a follow up (R. 305). He complained of continued mild low back pain and pain in his left thigh and calf with some numbness. He did state he felt much better than he had preoperatively. Dr. Douglas noted that Plaintiff's motor strength and bowel and bladder functions were normal. Dr. Douglas opined that Plaintiff was

improving, refilled Plaintiff's pain medications and recommended physical therapy.

Plaintiff started physical therapy on April 16, 2002, about a month post-op (R. 238). It was noted he was reluctant but ready to begin. After his first session he had a lot of pain and decreased flexibility. At his session two days later, he reported he had been in a lot of pain since the first session. It was determined the therapist would take a more conservative approach and use modalities and not much activity for the time being.

On April 22, Plaintiff reported to physical therapy still reporting considerable pain with most activities. His tolerance was poor - - "all activity seem[ed] to increase pt's pain." Two days later, he was still in considerable pain, but said he did feel better for a couple of hours after his last visit. On this date he tolerated the modalities well.

On April 25, Plaintiff reported the stretches were making his back seem better. His tolerance had increased "some" and was reported as "fair."

On May 1, 2002, Plaintiff reported he had been stretching at home; however he had walked up a hill at home and had some increased pain as a result (R. 237). He tolerated his therapy well and was able to do stretches with less pain and stretch further. The next day he reported continued progress (R. 236).

On May 8, Plaintiff reported his back had been a little sore since his last session, but he tolerated his session well. On May 16, he reported the pain continued to be pretty bad and that he was going back to the doctor the next week (R. 235). On May 20, Plaintiff still reported pain, but said he could do a little more. He tolerated the treatment that day very well, but was still very limited with stretches. On May 22, Plaintiff reported being sore one or two days post session, but was feeling better today. He tolerated the session well. On May 24, 2002, Plaintiff said he felt much

better than when he first started physical therapy (R. 234). He tolerated the session well and it was recommended he continue. The therapist reported Plaintiff had "improved considerably with physical therapy" as of May 24, but also noted he never returned after that session. He was therefore formally discharged from physical therapy on September 15, 2002. It was noted that, although his condition had improved considerably, because he had never returned, the physical therapist also had to note he was "unsure of how much actual progress [was] made" (R. 233).

On May 29, 2002, five days after he apparently ended physical therapy on his own, Plaintiff presented to Dr. Douglas with continued complaints of low back pain and pain in his left thigh and calf (R. 304). He said he was having increasing pain "since completing physical therapy." Dr. Douglas recorded no clinical examination findings, but ordered a repeat MRI and return to the clinic afterwards.

On June 7, 2002, Plaintiff underwent a lumbar spine MRI, which revealed epidural fibrosis (scar tissue) at the surgical site, extending around the thecal sac and the exiting nerve root, but Dr. Douglas confirmed there was no compression and no evidence of a recurrent disc herniation (R. 303, 319). There were mild disc bulges at other levels with no significant stenosis.

On June 19, 2002, Plaintiff presented to Dr. Douglas with continued complaints of low back pain and intermittent left leg pain (R. 303). He said the left leg pain was better than it was before surgery, but that he was having increasing back pain. Dr. Douglas opined that the MRI of June 7 revealed fibrosis but no compression on the thecal sac and no recurrent disc herniation. Due to Plaintiff's continued complaints of pain, Dr. Douglas ordered an EMG/NCV of the legs; flexion and extension lumbosacral films; and blood work including a sedimentation rate and CBC.

June 21, 2002, x-rays of the spine showed partial compression of the L1 vertebral body which

appeared slightly more severe than on the previous MRI, as well as degenerative changes at the lower lumbar levels (R. 318).

A June 21, 2002 EMG of Plaintiff's legs was normal (R. 315).

On June 28, 2002, Plaintiff presented to Dr. Douglas with complaints of "some" low back pain and "some" left leg pain (R. 302). He said he did feel better than before surgery. Dr. Douglas noted that the June 21 x-rays revealed partial fracture of L1; the EMG was normal.

June 28, 2002, flexion and extension lumbosacral x-rays were not significantly changed from the June 21 x-rays (R. 370). There was no significant abnormal movement with flexion or extension. There was partial compression of the L1 vertebral body, disc narrowing and degenerative changes at the L4-5 and L5-S1 levels, and degenerative changes at the lower lumbar facet joints.

On July 30, 2002, Plaintiff complained to Dr. Douglas of continued low back pain and of intermittent leg pain (R. 301). He said the leg pain was much improved post surgery. Dr. Douglas noted the flexion and extension studies of June 28 revealed no significant change from June 21, and that there was no abnormal movement in flexion or extension. Dr. Douglas referred Plaintiff to pain management, but Plaintiff elected to wait until the new pain management doctor arrived in September.

On November 23, 2002, four months later, Plaintiff presented to Arturo Sabio, M.D. for a physical examination for the State Disability Determination Service (R. 241). Plaintiff complained of constant pain radiating up to the neck from the lumbar spine. He was referred by his surgeon, Dr. Douglas, to the Pain Clinic and was scheduled to go there in the "near future." He complained of pain in the lumbar spine radiating to the left leg. Sometimes the left leg got numb and weak. He had had an MRI which indicated scar tissue formed after the operative procedure. He complained of

increased pain with repetitive bending and lifting, increased pain after sitting for more than ten minutes, or from riding in a car more than 60 miles. He complained of leg pain on and off on the left radiating from his lower back  A prescription for Bextra was not helping his back pain. Dr. Sabio summarized his findings as follows: Plaintiff had a scar over the lumbar spine and there was tenderness over the scar and over the lumbar muscles on the left side. There was restriction in straight leg raising to 60 degrees bilaterally due to lumbar spine pain. There was restriction of lumbar flexion to 45 degrees due to lumbar spine pain. Left hip flexion was restricted to 90 degrees due to pain in the lumbar spine. Plaintiff had a normal gait and did not require any ambulatory aid. He was stable at station. He had no muscle atrophy or weakness and no neurological deficit.

Plaintiff presented to Dr. Mona Justo, a pain specialist, on November 25, 2002 (R. 281). Plaintiff said he had done well post surgery, but reported he was a month post-op when he felt something pull in his back while undergoing physical therapy.[1] Since then he had progressively increasing pain in his low back radiating down into his left leg in the same distribution as his original complaint. Upon examination, Dr. Justo found tenderness along Plaintiff's left side; +2 deep tendon reflexes bilaterally; superficial touch and pain sensation intact bilaterally; +2 reflexes on the right and +1 on the left at the patella and ankle; slight weakness over the left EHL, but otherwise grossly normal motor strength; positive straight leg raising; and negative sitting nerve root tension test and Patrick's test bilaterally (R. 281-285). She found tenderness of the left trapezius muscle, left shoulder girdle, suprascapular, left rhomboid, infrascapular muscles, the spinous processes and paravertebral muscles of the lumbar spine, PSIS, left sciatic notch, tensor fascia latae, subacromial

---

[1]The undersigned notes Plaintiff did not begin physical therapy until a month post-op, and that there is no report that he pulled something in his back during physical therapy. In fact, about five weeks after he started physical therapy he said he felt much better.

bursa, biceps, triceps, brachioradialis muscles on the left, and left iliotibial band. There was decreased sensation along the C5-6 distribution on the left; positive Tinel's bilaterally; positive Phalen's bilaterally; decreased sensation over the left lower extremity; reduced patellar reflex on the left; reduced ankle reflex on the left; positive straight leg raising more on the left than the right; negative sitting nerve root tension test; and Gaenslen's positive on the left.

Dr. Justo agreed with Dr. Douglas that Plaintiff's x-ray of the lumbar spine dated June 28, 2002, showed no significant change from the prior study dated June 21, 2002. She also noted that x-ray showed partial compression at L1 and disc space narrowing, but no degenerative changes at L4-5 or L5-S1. She also confirmed that Plaintiff's EMG was normal and non-supportive of polyneuropathy or L3-S1 radiculopathy on either side. She reported that Plaintiff's June 7, 2002 MRI showed an enhancing scar tissue at the surgical site, extending around the left side of the thecal sac, surrounding the exiting nerve root, and confirmed, as did Dr. Douglas, that there was no evidence of compression on the thecal sac, no recurrent disc herniations, and no significant signs of stenosis. Dr. Justo's impression was low back and left leg pain status post lumbar microdiscectomy; lumbar radiculopathy; epidural fibrosis; myofascial pain; left subacromial bursitis; and bilateral carpal tunnel syndrome. She recommended epidural steroid injections, and, if they did not help, lysis of the epidural scar tissue/fibrosis. She prescribed Neurontin and suggested Plaintiff might benefit from muscle relaxants.

Plaintiff received pain injections on December 10, 2002, which he later said helped for only two weeks.

On December 4, 2002, State agency reviewing physician Thomas Lauderman, D.O., opined that Plaintiff was not disabled and could perform at the medium exertional level (R. 262). This is

the last record prior to Plaintiff's date last insured of December 31, 2002.

Plaintiff received pain injections on January 9, and January 24, 2003, which he again said helped for only two weeks (R. 272, 276, 293, 334). Dr. Justo then prescribed Ultram 1-2 every six hours for pain, and Topamax, 1 twice a day for the first three days, then 2 twice a day (R. 271).

On January 29, 2003, Plaintiff received a TENS unit with instructions for use and care (R. 298).

On January 31, 2003, Dr. Douglas noted that Plaintiff had undergone two epidural steroid injections and was now wearing a TENS unit (R. 300). Yet he continued to complain of low back and left leg pain, as well as cervical and thoracic pain. Dr. Douglas reviewed the June 7 MRI, which he again opined showed epidural fibrosis with no compression of the thecal sac and no recurrent disc herniation. He ordered a repeat lumbar MRI and a cervical and thoracic MRI.

On February 4, 2003, Dr. Douglas completed a form for the Boilermakers National Health and Welfare Fund, opining that Plaintiff had been totally disabled from January 31, 2002, to the "present" (R. 322). "Totally disabled," however, is defined on the form as "Prevented solely because of disease or accidental bodily injury, from engaging in substantially all of the normal activities of his/her occupation" (R. 323) (emphasis added).

A February 9, 2003, MRI of the cervical spine indicated tiny focal disc protrusion at the C5-6 level, suspicious of a tiny disc herniation, mildly indenting but not significantly impinging on the neural elements of the thecal sac (R. 311). An MRI of the thoracic spine showed a tiny central focal disc herniation at the T9-10 level with no significant impingement on the neural elements, and mild degenerative disc disease at the T11-12 level. MRI of the lumbar spine revealed the postoperative scarring at the L4-5 level, but indicated the intensity of the scar was much less than the previous

examination, although its size remained similar. There was degenerative disc disease seen at L3-4 and L5-S1 with diffuse bulging discs at these levels, but no focal disc herniation or spinal stenosis.

On March 4, 2003, Plaintiff's last visit with Dr. Douglas, the doctor noted Plaintiff's continued complaints of low back pain and intermittent left leg pain, but reported   Plaintiff had "much improved" postoperatively (R. 299). He was currently taking Bextra and had an upcoming appointment with Dr. Justo. Dr. Douglas noted that MRI's taken February 9, 2003, revealed: 1) a tiny disc protrusion at the C5-6 level of Plaintiff's cervical spine with no significant nerve root compression, spinal stenosis or spinal cord compression; 2) a focal protrusion at the T9-10 level of the thoracic spine with no nerve root compression or spinal cord compression; and 3) postoperative scarring in the lumbar spine MRI that "appear[ed] to be much less intense on today's examination than on prior examination" (R. 299). Dr. Douglas released Plaintiff from his care, recommending he keep his upcoming appointment with Dr. Justo and return to see him on an as-needed basis (R. 299). The record shows no additional treatment by Dr. Douglas.

On March 13, 2003, State agency physician Hugh M. Brown, M.D., opined that Plaintiff was limited to light work (R. 326), but further reduced his residual functional capacity ("RFC") to sedentary based on subjective pain and objective findings.   He could perform all posturals occasionally (R. 327). He had no manipulative limitations (R. 328).

On March 13, 2003, Plaintiff presented to Physician's Assistant G. Benjamin Baker to establish care and discuss his blood pressure (R. 211, 495). Mr. Baker noted that he observed Plaintiff had trouble sitting for prolonged periods. After sitting or standing more than five minutes he had to change positions. He appeared more comfortable standing. Plaintiff also reported 7 out of 9 questions in the depressive category on a questionnaire and reported several days a week he

would feel better off dead or hurting himself.[2]  On the other hand, he said the problems he checked

off made it only "somewhat difficult" for him to do work, take care of things at home or get along

with other people.  He had no clear plan of committing suicide, no clear intention of committing

suicide, and denied suicidal ideation.  He reported no anxiety attacks in the last month.  His biggest

concern was having no income.  He was diagnosed with hypertension, chronic low back pain, and

depression (R. 497).  His medications were continued, with Lexapro added for depression.

On April 16, 2003, Plaintiff presented to Dr. Justo with continued complaints of lower back

pain and left leg pain (R. 379).  He said the muscle relaxer caused "jumping" or jerking and the

Topamax caused headache. Dr. Justo discontinued the Topamax and muscle relaxer and prescribed

phenergan and methadone.

Plaintiff presented to Dr. Justo on May 2, 2003, saying he tolerated the methadone well and

it helped with the pain (R. 377).  She continued that medication as well as Ultram.

On June 27, 2003, Plaintiff said he still at times had pain in his lower back at a level 10, and

that any activity put him at level 10 (R. 370).  The methadone was helping but caused increased

constipation.  Increased activity exacerbated his pain, and he took the medications only as needed

due to the constipation. Dr. Justo discontinued the methadone, and prescribed a Duragesic patch and

---

[2]On the questionnaire he checked that he was bothered more than half the days in the last
two weeks by trouble sleeping, and several days in the last two weeks by little interest or pleasure
in doing things, feeling down, depressed, or hopeless, feeling tired or having little energy, trouble
concentrating on things, moving too slowly or being fidgety and restless; and thoughts that he
would be better off dead or hurting himself in some way (R. 498).  On the other hand, he reported
not being bothered at all by worrying about his health, his weight, little or no sexual desire or
pleasure during sex; difficulties with his wife; stress of taking care of family members; stress at
work or school; having no one to turn to; something bad that happened recently; or thinking or
dreaming about something terrible that happened in the past (R. 499).  He reported the most
stressful thing in his life was "no income."

Miralax for constipation.

On July 2, 2003, Plaintiff presented to PA Baker for a blood pressure check (R. 502).

On September 18, 2003, Plaintiff had a psychological evaluation performed by Martin Levin, M.A., at the request of counsel (R. 340). Mr. Levin observed that Plaintiff was pleasant and cooperative; his posture and gait were within normal limits; and there were no unusual involuntary movements noted. He appeared to be able to move about without assistance, although he indicated he needed a cane occasionally because he began to hurt after short periods of moving around. Plaintiff said his mood was depressed with some anger problems and often he often simply wanted to be off by himself due to feeling sad and angry. He denied crying spells, stating that he felt like crying, but would "fight it off." He had suicidal thoughts and some anxiety, but not enough to be considered a full panic syndrome. He had no prior mental health exams or treatment, aside from getting medications from his family doctor. His current medications included Topamax,[3] Tramadol,[4] and Orphenadrine.[5]

Upon mental status examination, Mr. Levin found Plaintiff pleasant and cooperative "although he was obviously in pain" (R. 341). His speech was normal and he was fully oriented. His mood was depressed and his affect was flat. There were no abnormalities of thought process or thought content. Mr. Levin took note, however, that Plaintiff indicated he had a "ghost in the house"

_____

[3]An anti-seizure medication. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY at 1965, 1966 (31st ed. 2007).

[4]An opioid analgesic used for the treatment of moderate to moderately severe pain following surgical procedures and oral surgery. Id. at 1977.

[5]A muscle relaxant used for acute spasm of voluntary muscles, regardless of location, especially posttraumatic, discogenic and tension spasms. Id. at 1358.

as well as "a guy in a checkered shirt" who he said he saw in and about his house "but no one else is able to see." His memory was average, as was his concentration, persistence and pace. He behaved in a socially appropriate manner "although he was obviously in pain."

Plaintiff's IQ was 80 verbal, 91 performance, and 84 full scale, which Mr. Levin found to be valid (R. 343). He read at the high school level, spelled at the 7th grade level, and did arithmetic at the 6th grade level. Plaintiff's results on the MMPI-II were unusual, as follows:

> At first glance the MMPI-2 validity scales might indicate an invalid profile, indicating that Mr. Dean may have been answering in an unorthodox manner or that he may have been trying to make himself look better, or worse, than he actually is. However, in Mr. Dean's mental status examination he indicated having hallucinatory symptoms and this is consistent with the interpretation of the MMPI-2. As such, this examiner believes that the MMPI-2 is an accurate picture of Mr. Dean's current psychological functioning.

> Mr. Dean's validity scale showed a pattern similar to people who may be suffering from psychosis. His scores on clinical scales are similar to those of people who are likely to present somatic complaints of a bizarre nature. They even may have somatic delusions. These complaints may represent defenses against the emergence of actual psychotic material. People with this profile are easily distracted and confused and often report concentration and memory difficulties. They tend to be socially inept and inadequate. They often have poor work histories and may even include a nomadic life style. People with this profile tend to feel alienated, isolated, and different from other people, tend to distrust others, and may be seen by others as odd, strange, or bizarre.

(R. 343).

Plaintiff described his daily activities as follows:

> On a typical day Mr. Dean arises in pain and it takes him approximately two to three hours to get moving well. He enjoys going down to the local gas station and visiting with friends although he does not feel like doing much of anything else. He tends to move around a lot because he feels better moving than sitting still. He indicates that he used to enjoy hunting and fishing but has not done much of anything for fun because of his present physical condition. He does go to Wal-Mart on occasion. He enjoys watching TV in the evening and he also does little odds and ends around the house. He does not attend church or belong to any other social organizations.

(R. 344).

Mr. Levin diagnosed Plaintiff with Major Depressive Disorder, Recurrent, Severe with psychotic features (R. 344). His prognosis was poor.

Mr. Levin completed a Psychiatric Review Technique ("PRT"), opining that Plaintiff met Listing 12.04 for affective disorders (R. 345). He neglected, however, to complete the "B" criteria of the Listings (R. 355).

Mr. Levin also completed a Mental Residual Functional Capacity Assessment of Work-Related Abilities ("MRFC"), opining that Plaintiff would have no limitations in working in coordination with others without unduly distracting them; maintaining an acceptable standard of grooming and hygiene; asking simple questions or requesting assistance from coworkers or supervisors; being aware of normal hazards and taking appropriate precautions; carrying out an ordinary work routine without special supervision; and traveling independently in unfamiliar places.

Mr. Levin found Plaintiff would have mild limitations in understanding, remembering, and carrying out short, simple instructions; maintaining regular attendance and punctuality; interacting appropriately with the public; responding appropriately to direction and criticism from supervisors; working in coordination with others without being unduly distracted by them; maintaining acceptable standards of courtesy and behavior; relating predictably in social situations in the workplace without exhibiting behavioral extremes; demonstrating reliability and ability to respond to changes in the work setting or work processes; and setting realistic goals and making plans independently of others. Mr. Levin explained that Plaintiff's level of depression, along with possible psychotic episodes, would compromise his ability in all of the areas checked as "mild." In particular, his level of depression and psychosis would cause some difficulty in responding to changes in the work setting

and with goal setting and planning.

Mr. Levin opined that Plaintiff would have moderate limitations in understanding, remembering, and carrying out detailed instructions; exercising judgment or making simple work-related decision; sustaining attention and concentration for extended periods; completing a normal workday and workweek without interruptions from psychological symptoms; and performing at a consistent pace without an unreasonable number and length of work breaks. Mr. Levin explained these moderate limitations were a result of Plaintiff's level of depression being significant enough that it would impair his ability to sustain activity and tolerate ordinary work stress; his poor memory; his impaired judgment if in a psychotic state or even in a significantly depressed state without psychotic symptoms. Finally, Mr. Levin explained that Plaintiff's level of depression would increase with increased stress, lending to increased likelihood of withdrawal behavior or a possible psychotic episode.

Mr. Levin opined that the impairments and limitations he identified would have probably existed at their current level of severity since January 31, 2002, the alleged onset date (R. 363).

Plaintiff presented to Dr. Justo on October 8, 2003, for followup (R. 479). He complained of difficulty sleeping, and that his medications helped but caused nausea. He continued to have lower back and neck pain. Dr. Justo noted that Plaintiff had failed injection treatment and medications, and was to try Duragesic patch.

X-rays of both Plaintiff's shoulders on October 29, 2003, were normal (R. 364).

Nerve Conduction Studies on October 29, 2003, ten months after Plaintiff's date last insured, were abnormal, and supportive of bilateral carpal tunnel syndrome. "The changes were fairly prominent on both sides" (R. 367).

On October 20, 2003, Plaintiff called Dr. Justo's office complaining that the medication was making him sick with vomiting (R. 455). The doctor changed his compazine to reglan.

On November 21, 2003, Plaintiff presented to Dr. Justo with continued lower back pain at a level of 4-5 out of ten, and pain in his shoulders at a level of 4-5 out of ten (R. 473). The doctor found Plaintiff was doing well, and was able to increase his activities of daily living with help of the Duragesic patch, but did not feel it lasted long enough, so the doctor increased his dosage.

On December 13, 2003, Plaintiff presented to the emergency room, "in a depressed state, just not all there" (R. 419). He said he was in constant pain at a level of 4 out of 10, that his medication made the pain better, and that "working" made it worse. The diagnosis was anxiety and depression.

On December 15, 2003, Plaintiff presented to Dr. Justo, with complaints of anxiety/depression from the Duragesic patch (R. 469). He had taken the patch off the previous Saturday and felt better except his back hurt. He had the patch back on but was later in emergency room where he was given lorazepam. He reported pain in his back at a level 4. Dr. Justo discontinued the Duragesic and prescribed MSContin[6] and referred Plaintiff for a psychological consult.

On December 16, 2003, Dr. Justo increased Plaintiff's MSContin to a total of 45 mg per day (R. 455).

On December 30, 2003, Plaintiff's MSContin was refilled (R. 454).

On January 7, 2004, Plaintiff presented to Dr. Justo with complaints of pain at a level of 4, radiating down his left leg (R. 464). Sitting increased the pain. He felt the MSContin was only

---

[6]An opioid analgesic having powerful analgesic action and some central stimulant action . . . It is used as an analgesic for relief of severe pain . . . . Id. at 1203.

lasting eight hours. Dr. Justo increased his MSContin.

On January 9, 2004, Plaintiff called Dr. Justo's office and said the increased MSContin was doing well (R. 454).

On February 10, 2004, Plaintiff called Dr. Justo's office to obtain a refill of his MSContin (R. 454).

On February 19, 2004, Plaintiff presented to Dr. Justo with complaints of low back and left leg pain (R. 460). Plaintiff was doing well with no major complaints. He reported he needed to pace his activity so as not to exacerbate pain. He was able to do some activities of daily living without much discomfort. He had no new complaints and was tolerating the increased MSContin.

On May 5, 2004, Plaintiff called Dr. Justo's office for a refill of his MSContin (R. 452).

On May 21, 2004, Plaintiff called Dr. Justo's office for a refill of his sleep medications (Doxepin) (R. 452).

On June 8, 2004, Plaintiff called Dr. Justo's office for a refill of his MSContin (R. 452).

On July 16, 2004, Plaintiff presented to Dr. Justo with complaints of lower back pain going down his left leg (R. 456). The doctor found he was doing well, with "good and bad days." His pain was slightly increased due to walking, but he was able to do some activities of daily living. He was continued on the MSContin.

On September 24, 2004, Plaintiff did not present for his appointment with Dr. Justo (R. 452). This is the last record of an appointment with the pain specialist until September 2005.

October 14, 2004, cervical spine x-rays were normal (R. 428).

On January 20, 2005, Plaintiff presented to Dr. Chadwick Smith, M.D. for follow up (R.

429).[7] He said he had been doing well. He had been taking one Percocet at bedtime with no complications, but had needed to take an extra ½ in the morning as his mother was recently hospitalized with a mild MI and he had been up on his feet standing more. He was willing to taper down when she got better. Otherwise he was doing well and the pain was fairly well controlled with no side effects. Currently his pain was a level 2. The diagnosis was chronic low back pain and high blood pressure. Dr. Smith gave Plaintiff Flexeril to take while he was having problems with his mother, and also increased his Percocet.

Plaintiff saw Dr. Smith on April 25, 2005, for follow up of his chronic back and leg pain (R. 434). He said he had left the pain clinic because they had put him on long-acting morphine and this was not really what he wanted, stating he wanted to be on something a little less strong and sedating. He began following with Dr. Smith, who treated him with percocet which seemed to control his pain well, "however he states as he is doing more this summer it is starting to wear off a little early in the morning as his half tab is not doing it." Flexeril helped him sleep and he wondered if he could increase it. His pain was 3 out of 10, but could go as high as 7 "when he is riding on his riding lawnmower for more than ½ hour." The diagnosis was chronic low back pain and well-controlled hypertension. Dr. Smith increased both the Percocet and Flexeril to twice daily.

On August 18, 2005, Plaintiff presented to Dr. Smith for followup of his chronic pain (R. 443). Plaintiff stated that only the Percocet seemed to help him, but the dose he was on was "not working as well as he would like." He would like to increase the frequency. Plaintiff said he was

---

[7]The undersigned notes there were no previous reports of office visits with Dr. Smith at the time the claim was before the ALJ; however, counsel submitted records of previous visits to Dr. Smith to the Appeals Council. These records are presented separately under "Evidence Submitted to Appeals Council."

not taking extra on his own and would not. The Dr. noted he had never shown any signs of abuse. He diagnosed well-controlled hypertension and chronic neck pain, chronic back pain, and myofascial pain syndrome (taken from the pain clinic). He also increased Plaintiff's Percocet.

On September 8, 2005, Plaintiff called Dr. Smith's office and said that at the last office visit he told him his medication was not helping and sometimes he took extra, and now he was completely out (R. 446). He said his back was hurting clear up to his neck. The office returned Plaintiff's call the next day at which time Plaintiff said he had enough meds for five more days.

Plaintiff underwent another psychological evaluation on October 26, 2005, at his counsel's request, performed by Cynthia Hagan, MA, supervised psychologist (R. 383). Plaintiff reported being sad and irritable much of the time, feeling his high level of pain, inability to be active, and uncertain future all contribute to his depression. He also reported uncontrollable general worry and anticipatory anxiety. He confirmed past suicidal ideation and said that about a year ago he "was pretty close to doing it." He said his moods had been somewhat better since being prescribed morphine for pain.

Plaintiff said he had difficulty sleeping, and that on an average night he slept about four hours (R. 386). Sleep was interrupted by racing thoughts, and nightmares, and he also sleepwalks. His appetite was bad, and his concentration was horrible. He said he was easily distracted. He said he had no friends, even though he typically had no difficulty making friends. Friends visit him in the house, but he rarely went out, being bothered by large crowds and loud environments. He did not visit others or entertain visitors at home. He enjoyed talking with his family, and watching television when alone.

On mental status exam, Ms. Hagan found Plaintiff adequately dressed and groomed (R. 386).

He made good eye contact. Psychomotor activity was average. He was friendly, polite and cooperative, and rapport developed easily. His short term memory was significantly impaired. His concentration was impaired. He was fully oriented and able to interpret parables. His affect was appropriate and reactive. His observed mood was anxious and depressed. He described his mood as "down but okay." His speech was normal and attention and concentration adequate for the evaluation. He could understand and follow instructions. Ms. Hagan felt the evaluation was valid.

Plaintiff's IQ was 83 verbal, 83 performance, and 81 full scale (R. 387). He read at the high school level, spelled at the fourth grade level, and did arithmetic at the fifth grade level.

Ms. Hagan opined that Plaintiff's MMPI-2 profile was "an invalid representation of Mr. Dean's current psychological functioning," explaining that it appeared as if he lacked insight into his psychological issues. His F-K index was too high for the profile to be interpreted in an ethical manner, according to instructions.

On the Beck Depression Inventory Plaintiff reported depressive symptoms within the severe range. He reported symptoms on the Beck Anxiety Inventory that were also within the severe range (R. 389). Ms. Hagan diagnosed Major Depressive Disorder, Recurrent, Severe, and Generalized Anxiety Disorder.

Ms. Hagan completed a PRT, opining that Plaintiff had a depressive syndrome (12.04), and an anxiety disorder (12.06). She opined he would have a marked restriction of activities of daily living, marked difficulties in maintaining social functioning, marked difficulties in maintaining concentration, persistence or pace, and had one or two episodes of decompensation, each of extended duration (R. 401).

Ms. Hagan also completed an MRFC, opining Plaintiff would have moderate limitations in

understanding, remembering, and carrying out short, simple instructions; exercising judgment or making simple work-related decisions; working in coordination with others without distracting them or being unduly distracted by them; maintaining acceptable standards of courtesy and behavior; and setting realistic goals and making plans independently of others.

Plaintiff would have marked limitations in understanding, remembering, and carrying out detailed instructions; sustaining attention and concentration for extended periods; maintaining regular attendance and punctuality; completing a normal workday and workweek without interruptions from psychological symptoms and performing at a consistent pace without an unreasonable number and length of work breaks; interacting appropriately with the public; responding appropriately to direction and criticism from supervisors; relating predictably in social situations without exhibiting behavioral extremes; demonstrating reliability; ability to respond to changes in the work setting or work processes; ability to be aware of normal hazards and take appropriate precautions; carrying out an ordinary work routine without special supervision; and traveling independently in unfamiliar places; and ability to tolerate ordinary work stress.

Ms. Hagan opined that Plaintiff's impairments and limitations probably existed at their current level of severity since January 31, 2002, the alleged onset date (R. 409).

Dr. Smith completed a functional assessment on 11/23/05, opining that Plaintiff could not do even sedentary work. He could not lift more than five pounds, must frequently change positions to sit, stand, and even lie down. Sitting and standing were limited to 10 minutes at a time with frequent ½ hour breaks as needed for postural changes including lying down. Chronic pain was moderate to severe. His hands could be used for repetitive or prolonged simple grasping and manipulation, but no arm or leg controls. He could not sit upright for prolonged periods with his

head flexed. He could never perform any posturals except for occasionally stretching (R. 415). He would have to avoid all exposure to machinery jarring or vibrations, and must avoid concentrated exposure to all other environmental conditions and hazards. He would be expected to experience chronic pain, moderate to severe and intermittent severe pain. He did not need a cane or other assistive device. He could perform repetitive simple grasping and fine manipulation, but had reduced grip strength due to carpal tunnel syndrome. Pain would cause absence. Dr. Smith opined that Plaintiff could [not] have performed a full-time job since January 31, 2002, his alleged onset date (R. 411-418).

On December 16, 2005, Dr. Smith clarified his opinion at the request of counsel, indicating Plaintiff's feet did not require elevation but change of position, including standing, sitting, reclining, was beneficial for pain. Further, Plaintiff's carpal tunnel syndrome would not be worsened by fine manipulation such as working at a desk or filing, but would be worsened by typing or using a screwdriver.

On January 5, 2006, counsel submitted to the ALJ a "clarification" of the "Social Functions" section of Cynthia Hagan's October 2005 psychological evaluation (R. 483). Between the sentences "Mr. Dean reports that he has a no close friends" and "Terry reports that he typically has no difficulty making friends. Friends visit him in the house but he rarely goes out . . . . He does not visit others often or entertain visitors at home," is added the sentence: "However, he does have persons whom he considers friends."

## Evidence Submitted to Appeals Council

On November 20, 2006, Plaintiff submitted additional evidence to the Appeals Council (R. 494), as follows:

On March 13, 2003, Plaintiff presented to Physician's Assistant G. Benjamin Baker "to establish his care and to discuss his BP" (R. 495).

On July 14, 2003, Plaintiff presented to Dr. Zubaer Dawlah, M.D. (In the same office as PA Baker) for a blood pressure followup (R. 504). He also had a "history of back pain for which he is going to a pain clinic." He was on a Duragesic patch, Ultram, Robaxin, and Avapro. He had no particular complaints with his medications, but stated that he still had pain with exertion and was unable to walk more than 400 feet at a time despite medication. He also stated that he was "physically active at home and tries to stay active." He was slightly constipated. Dr. Dawlah diagnosed hypertension, abnormal LFT blood test, and history of low back pain that appeared to be stable.

On October 29, 2003, Plaintiff presented to Dr. Dawlah with complaints of persistent pain in the shoulder area and numbness and constant discomfort in his hands (R. 507). He reported that sometimes his hand grip was weak, especially on the left. He was already taking pain medications through the pain clinic for his back. Examination of his shoulders showed restricted abduction and internal rotation bilaterally and slight discomfort over the subdeltoid bursa area. His handgrips were symmetrical, and Tinel's sign was positive. The doctor diagnosed "most likely" bilateral carpal tunnel syndrome, and shoulder pain "most likely subdeltoidal bursitis." He referred Plaintiff for EMG nerve conduction studies and shoulder x-rays. (As already noted in the evidence before the ALJ, the EMG supported a diagnosis of bilateral carpal tunnel syndrome, while the shoulder x-rays were normal).

On January 23, 2004, Plaintiff presented to Dr. Dawlah for followup of his high blood pressure (R. 514). He continued to have low back pain and pain in his shoulders and arms. He was

continuing to get pain medication from the pain clinic, and did not want injections for his shoulders. Upon examination, Plaintiff had positive straight leg raising due to back pain, and also "seem[ed] to have" pain in the subdeltoid bursa area "and shoulder joints movement is somewhat restricted from that." Dr. Dawlah diagnosed hypertension, history of low back pain/shoulder pain which is most likely related to subdeltoid bursitis.

On July 23, 2004, Plaintiff presented to Dr. Chadwick Smith, M.D. (In Dr. Dawlah's office) for follow up of his hypertension and carpal tunnel syndrome (R. 519). His blood pressure was controlled quite well on his medications. He reported bilateral wrist pain and pain in the thumb and first and second digits for approximately the past year.[8] Plaintiff stated his back pain was extremely worse at night and had recently become intolerable. He followed with the pain center in Weston, but those doctors would no longer be coming to Weston and he was going to have to try to transfer that care to Dr. Dawlah. Dr. Justo was to send a letter to Dr. Dawlah. Dr. Smith diagnosed hypertension, carpal tunnel syndrome, and elevated cholesterol, and prescribed wrist splints for what appeared to be "severe" carpal tunnel syndrome. The doctor recommended EMG and surgical consult, but Plaintiff said he could not afford them.

On October 14, 2004, Plaintiff presented to PA Baker for a check up and complaints of a bulging disc in his neck (R. 521). He said he had neck pain for one week due to crawling under the house. The pain started out as 3 out of 10, then 8, and currently 2 out of 10. Cervical spine x-rays were normal (R. 523).

On December 23, 2004, Plaintiff presented to Dr. Smith for his low back pain (R. 524). He reported he previously saw Dr. Justo, but "thought Dr. Gusto [sic] was over medicating him w/him

---

[8]The court notes this would be well after his date last insured.

26

taking Morphine 60 mg. bid." He had also been on Duragesic which he stopped by himself, going through some withdrawal. He was currently taking Percocet which was controlling his low back pain well. He had no problem with constipation. His hypertension was doing well. He had a runny nose for the past two weeks. Dr. Smith diagnosed low back pain, well-controlled hypertension, and sinusitis. He set up a pain contract with Plaintiff, which stated that he should not get meds from any other provider, use only one pharmacy, not call in for medications early, and if showed any signs of abuse would be discontinued. He then prescribed Percocet 7.5/325, one daily.

(Already in the record before the ALJ was the January 20, 2005 visit in which Plaintiff reported to Dr. Smith that he had been taking an extra ½ Percocet in the morning for the past two weeks due to his mother's recent hospitalization and his needing to be on his feet more. The doctor increased his Percocet to one at bedtime and ½ in the morning, and also prescribed Flexeril at bedtime while his mother was ill.)(R. 527)

(Also in the record already before the ALJ was the April 21, 2005 appointment with Dr. Smith, in which Plaintiff said he had not wanted to continue with the pain clinic because they had put him on long-acting Morphine, which was really "not what he wanted" (R. 530). He preferred to be on something "a little less strong" He was now taking Percocet twice daily, which controlled his pain well, "however he states as he is doing more this summer it is starting to wear off a little early in the morning." He wanted both his Percocet and Flexeril increased to two daily. He said his pain was 3 out of 10, although it could go up to 7 out of ten "when he is riding on his riding lawnmower for more than ½ hour." Dr. Smith increased his Percocet and Flexeril to two tablets daily.)

On August 18, 2005, Plaintiff presented to Dr. Smith for his chronic pain (R. 533). Plaintiff

said that only Percocet seemed to help his pain, but that the 7.5 dose he had been getting twice a day was "not working as well as he would like." He wanted to increase the frequency. He said he had not increased it on his own, and would not do so without consulting the doctor. Based on this, Dr. Smith increased Plaintiff's Percocet to 10/325 twice a day. He told Plaintiff, however, that if he needed a higher dosage, he would not be able to treat his pain as this was as high a dosage as he felt comfortable prescribing. The doctor prescribed Neurontin to add on to the Percocet.

On January 11, 2006, Plaintiff presented to Dr. Smith for followup of his back and neck pain (R. 541). He had seen Dr. Justo in Clarksburg. She said she would like to put him back on MSContin, but she was leaving the practice and did not feel comfortable starting him on it and then leaving, so she wanted him to discuss it with Dr. Smith. Plaintiff continued to have pain shooting down his left leg. He was taking his Percocet, but sometimes at a dosage of 1 ½ pills at a time. He was requesting MSContin, but Dr. Smith did not feel comfortable prescribing it because he "did not know how to prescribe it," and recommended he return to the pain clinic for that. Plaintiff then asked if he could have 70 percocet a month (two per day plus one more as needed), which the doctor prescribed.

On June 6, 2006, Plaintiff followed up with Dr. Smith, reporting that he had hit his back on a chair recently, "and his back has been hurting him since" (R. 548). He was using more Percocet than prescribed. Dr. Smith believed the pain was real and increased his Percocet to three times a day for the next month.

On June 29, 2006, Plaintiff presented to Dr. Smith's office (Dr. Smith was out of town) for a refill of his Percocet (R. 553).

On August 31, 2006, Plaintiff presented to Dr. Smith for followup of his low back pain and

hypertension (R. 558). He was doing well with his back pain and taking Percocet twice a day. Dr. Smith was leaving the practice and gave Plaintiff a prescription for 90 Percocets so he could get through until the new doctor arrived.

On September 25, 2006, Plaintiff presented to Dr. Smith for a refill of his Percocet (R. 560). He was given a prescription for 90.

On October 20, 2006, Plaintiff presented to Dr. Smith's former office for a refill of his Percocet (R. 562).

On October 30, 2006, Plaintiff received a prescription for Lexapro, but his new doctor wanted to discuss it with his primary care provider (R. 564). He was diagnosed with depression. He was also taking MSContin.

## III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520, the ALJ made the following findings:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2002.

2.    The claimant has not engaged in substantial gainful activity at any time relevant to this decision since December 15, 2003, the alleged onset date (20 CFR 404.1520(b)).

3.    The claimant has had the following severe impairment prior to the date last insured: vertebrogenic disorder; carpal tunnel syndrome; headaches; and depression (20 CFR § 404.1520(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform the exertional demands of light work, or work which requires maximum lifting of twenty

pounds and frequent lifting ten pounds; some light jobs are performed while standing, and those performed in the seated position often require the worker to operate hand or leg controls (20 CFR sections 404.1567 and 416.967). In addition, the claimant has the following exertional and non-exertional limitations; he must have the ability to briefly (one to two minutes) change positions at least every ½ hour; he can have no exposure to temperature extremes; he can have no exposure to significant workplace hazards like heights, or dangerous moving machinery; he can do no job requiring more than frequent fine manipulation with either hand; he can do no job requiring overhead reaching; he can do more than occasional climbing, balancing, stooping, kneeling, crouching, or crawling; he can do no more than fast-paced or assembly line work; he cannot do any task that required close concentration or attention to detail for extended periods; he cannot do work consisting of detailed or complex instructions; he cannot have any requirement to make workplace decisions; he can do not job that requires close interactions with coworkers or supervisors, or any contact with the general public; and he must be able to miss up to one day of work per month.

6.    The claimant is not able to perform any of his past relevant work (20 CFR § 404.1565).

7.    The claimant was born on April 13, 1954, and was 47 years old on the alleged disability onset date, which is defined as a younger individual, (20 CFR § 404.1563).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR § 404.1564).

9.    Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c) and 404.1566).

11.   The claimant has not been under a "disability," as defined in the Social Security Act, from January 31, 2002 through December 31, 2002, the date last insured (20 CFR 404.1520(g)).

(R. 19-29).

## IV. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit held, "Our scope of review is specific and narrow. We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence." Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" Hays, 907 F.2d at 1456 (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

### B. Contentions of the Parties

Plaintiff contends:

1.      The ALJ omitted a severe impairment and minimized others;

2.      The ALJ performed an inadequate analysis of listed impairments and misstated the facts;

3.      The ALJ did not perform a correct credibility analysis; and

4.      There is lack of substantial support for he ALJ's RFC finding.

Defendant contends:

1.    The ALJ correctly evaluated the severity of Plaintiff's impairments at Steps Two and Three of the sequential evaluation;

2.    The ALJ properly determined that Plaintiff's impairments did not equal any listed impairment; and

3.    The ALJ properly assessed Plaintiff's residual functional capacity and credibility.

## C.  Severe Impairments

Plaintiff first argues that the ALJ listed as severe impairments "only" "vertebrogenic disorder, carpal tunnel syndrome, headaches, and depression," and "omitted myofascial pain syndrome, which is not a vertebrogenic disorder, an independent source of widespread, chronic pain in the areas identified by Dr. Justo on 11/25/02" (Plaintiff's brief at 9).  Further, Plaintiff argues that the ALJ "did not even make vertebrogenic disorder plural," even though he had "numerous and wide-spread vertebrogenic disorders at all three levels of the spine."

Defendant contends that "[v]ertebrogenic is a widely recognized term used to identify a back impairment accompanied by pain, and perhaps weakness motor loss, and sensory disturbances [and that] [u]ntil recently, vertebrogenic was a term that this Agency used to identify listed back impairments, including, but not limited to, herniated nucleus pulposes and spinal stenosis."  Finally, "vertebrogenic is a term still used by various chiropractic websites to include instances of pain." (Defendant's brief at 9-10).

According to DORLAND'S ILLLUSTRATED MEDICAL DICTIONARY, 31st ed. (2007) vertebrogenic is defined as arising in a vertebra or in the vertebral column.  The undersigned finds the term does not need to be pluralized to represent several areas of the vertebral column.  On the other hand, myofascial disorder is a separate disorder, defined in DORLAND'S as "pertaining to or

involving the fascia surrounding and associated with muscle tissue." Id. at 1241. Although Dr. Justo diagnosed myofascial disorder, a mere diagnosis of a condition is not enough to prove disability. There must be a showing of related functional loss. See Gross v. Heckler, 785 F.2d 1163 (4th Cir. 1986). There is no showing of functional loss, prior to Plaintiff's date last insured, due to myofascial disorder beyond that already shown by objective evidence of vertebrogenic disorder. There is no evidence that myofascial pain was a "severe" impairment during the relevant time. For example, Dr. Justo found tender areas of the biceps and triceps, areas about which Plaintiff had not complained. Finally, even if myofascial pain were determined to be a "medically determinable impairment," the undersigned finds that the ALJ's functional limitations also covered any actual functional limitations caused by this impairment prior to the date last insured.

The undersigned therefore finds substantial evidence supports the ALJ's finding that Plaintiff's "only" severe impairments were vertebrogenic disorder, carpal tunnel syndrome, headaches, and depression.

### D. Listings

Plaintiff next argues that the ALJ performed an inadequate analysis of listed impairments and misstated the facts. Defendant contends that the ALJ properly determined that Plaintiff's impairments, either singly or combined, did not meet or equal any listed impairment. Plaintiff in particular argues:

> The ALJ did not even minimally meet the requirements of Cook v. Heckler, 783 F2d 1168 (4th Cir. 1986), did not even identify which musculoskeletal listings pertained. There was no analysis of whether the combined musculoskeletal impairments, carpal tunnel syndrome and myofascial pain syndrome might equal a listing. A medical expert might reasonably have concluded that one of the musculoskeletal listings was equaled.

(Plaintiff's brief at 11).

In Cook v. Heckler the Fourth Circuit held:

> The ALJ should have identified the relevant listed impairments. He should then have compared each of the listed criteria to the evidence of Cook's symptoms. Without such an explanation, it is simply impossible to tell whether there was substantial evidence to support the determination.

(Emphasis added). The undersigned finds the only musculoskeletal listing relevant to Plaintiff's impairments is 1.04, which requires:

> *Disorders of the spine* . . . resulting in compromise of a nerve root . . . or the spinal cord.
> With:
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
> or
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;
> or
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in an inability to ambulate effectively, as defined in 1.00B2b.

(Emphasis added). The ALJ found as follows:

> The objective medical evidence does not show that the claimant has nerve root compression with limitation of motion of the spine, motor loss with sensory or reflex loss, evidence of inflamed arachnoidal tissue resulting in the need for a change of position or posture every two hours, or evidence of stenosis that results in an inability to ambulate effectively.

Although the ALJ did not expressly state that he was considering Listing 1.04 it is apparent from a comparison of the Listing requirements and the ALJ's paragraph regarding the Listing that he was referring to 1.04. Further, the undersigned finds only 1.04 A applies in this case. Plaintiff's

34

argument must fail because, even if Plaintiff's physicians did make findings that "characterized" evidence of nerve root compression, his doctors expressly found there was no "compromise of a nerve root or of the spinal cord" and no "evidence of nerve root compression." On June 7, 2002, Plaintiff underwent a lumbar spine MRI, which revealed epidural fibrosis (scar tissue) at the surgical site, extending around the thecal sac and the exiting nerve root, but Dr. Douglas confirmed there was no compression. Shortly before Plaintiff's date last insured, Dr. Justo confirmed, as did Dr. Douglas, that there was no evidence of compression on the thecal sac, no recurrent disc herniations, and no significant signs of stenosis. The undersigned therefore finds Plaintiff does not meet Listing 1.04.

The undersigned further finds that, even combining Plaintiff's carpal tunnel syndrome and his non-severe myofascial pain with his spinal impairments, Plaintiff does not equal the listing. Social Security Ruling ("SSR") 96-6p provides:

> The administrative law judge or Appeals Council is responsible for deciding the ultimate legal question whether a listing is met or equaled. As trier of the facts, an administrative law judge or the Appeals Council is not bound by a finding by a State agency medical or psychological consultant or other program physician or psychologist as to whether an individual's impairment(s) is equivalent in severity to any impairment in the listing of impairments. However, longstanding policy requires that the judgment of a physician or psychologist designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge or the Appeals Council must be received into the record as expert opinion evidence and given appropriate weight . . . .

In this case, the ALJ had the opinion of State agency reviewing physician Thomas Lauderman within a month of Plaintiff's date last insured, finding Plaintiff was not disabled. Even three months after Plaintiff's date last insured, State agency physician Hugh M. Brown, M.D. also opined that Plaintiff was not disabled. Had either physician found that Plaintiff met or equaled any listing, he would not have been able to also find him not disabled. The ALJ was required to consider these

opinions as expert opinion evidence. These opinions substantially support the ALJ's determination that Plaintiff did not equal a listing. Further, on the facts of this case and pursuant to the Ruling, there was no requirement of an updated medical judgment as to medical equivalence.

The undersigned therefore finds substantial evidence supports the ALJ's finding that Plaintiff neither met nor equaled a listing.

### E. Subjective Complaints and Credibility

Plaintiff next argues that the ALJ did not perform a correct credibility analysis. Defendant contends the ALJ used the proper 2-step analysis identified in Craig v. Chater, 76 F. 3d 585 (4th Cir. 1996). The Fourth Circuit has held that "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir.1984) (citing Tyler v. Weinberger, 409 F.Supp. 776 (E.D.Va.1976)).

SSR 96-7p provides:

The regulations describe a two-step process for evaluating symptoms, such as pain, fatigue, shortness of breath, weakness, or nervousness:

> First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the individual's pain or other symptoms. The finding that an individual's impairment(s) could reasonably be expected to produce the individual's pain or other symptoms does not involve a determination as to the intensity, persistence, or functionally limiting effects of the individual's symptoms. If there is no medically determinable physical or mental impairment(s), or if there is a medically determinable physical or mental impairment(s) but the impairment(s) could not reasonably be expected to produce the individual's pain or other symptoms, the symptoms cannot be found to affect the individual's ability to do basic work activities.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record. This includes the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record. This requirement for a finding on the credibility of the individual's statements about symptoms and their effects is reflected in 20 CFR 404.1529(c)(4) and 416.929(c)(4). These provisions of the regulations provide that an individual's symptoms, including pain, will be determined to diminish the individual's capacity for basic work activities to the extent that the individual's alleged functional limitations and restrictions due to symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence in the case record.

The ALJ found that Plaintiff met the first, threshold, step under the Ruling, in that he had medically determinable impairments that could reasonably be expected to produce his pain. The undersigned has remanded cases where the ALJ skipped this first step; however, in this case, he did not. The undersigned will not require the ALJ use the specific "magic words" to simply find the Plaintiff met the first step.

The ALJ was next required to consider "all the available evidence," including that listed in the second step of the evaluation, including the medical signs and laboratory findings, Plaintiff's own statements about his symptoms, any statements and other information provided by treating or examining physicians and other persons about the symptoms and how they affected Plaintiff, and any other relevant evidence in the case record. A review of the decision shows the ALJ did note

Plaintiff's statements about his pain, his medical history, medical signs, and laboratory findings, objective medical evidence of pain, his daily activities, specific descriptions of the pain, and medical treatment taken to alleviate it. The problem in this case is the scarcity of the evidence before Plaintiff's date last insured of December 31, 2002. As the ALJ stated, "The objective medical evidence shows little evidence of impairments prior to the date the claimant was last insured, December 31, 2002."

There is no dispute that Plaintiff underwent a microdiskectomy in March 2002. In April, one month later, he told his surgeon that he had only mild back pain and pain in his left thigh and calf with some numbness. He also stated he felt much better than he had preoperatively. Dr. Douglas opined that Plaintiff was improving. One month after that, in May, Plaintiff told his physical therapist he felt much better than when he first started physical therapy (at which time he only had been complaining of mild pain and some numbness). The therapist found Plaintiff had "improved considerably" and recommended he continue. Yet Plaintiff never attended physical therapy again, stopping with no explanation. In June, Plaintiff complained of only "some" low back pain and "some" left leg pain, and said he felt better than before surgery. In July, Plaintiff complained of continued low back pain and only intermittent leg pain, much improved post surgery. Although Dr. Douglas referred plaintiff to pain management, Plaintiff did not go until four months later. There is, in fact, no record of examination or treatment from July 30, 2002, until Dr. Sabio's State agency-arranged examination. Plaintiff then went to the pain clinic for the first time two days later. He received a pain injection on December 10. This is the last record before Plaintiff's last insured date. This paragraph is therefore the summary of Plaintiff's entire treatment prior to his date last insured.

Additionally, SSR 96-7p provides, in pertinent part:

One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record. The adjudicator must consider such factors as:

> The degree to which the individual's statements are consistent with the medical signs and laboratory findings and other information provided by medical sources, including information about medical history and treatment.
>
> The consistency of the individual's own statements. The adjudicator must compare statements made by the individual in connection with his or her claim for disability benefits with statements he or she made under other circumstances, when such information is in the case record. Especially important are statements made to treating or examining medical sources and to the "other sources" defined in 20 CFR 404.1513(e) and 416.913(e). The adjudicator must also look at statements the individual made to SSA at each prior step of the administrative review process and in connection with any concurrent claim or, when available, prior claims for disability benefits under titles II and XVI. Likewise, the case record may contain statements the individual made in connection with claims for other types of disability benefits, such as workers' compensation, benefits under programs of the Department of Veterans Affairs, or private insurance benefits. However, the lack of consistency between an individual's statements and other statements that he or she has made at other times does not necessarily mean that the individual's statements are not credible. Symptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve with time, and this may explain why the individual does not always allege the same intensity, persistence, or functional effects of his or her symptoms. Therefore, the adjudicator will need to review the case record to determine whether there are any explanations for any variations in the individual's statements about symptoms and their effects.
>
> The consistency of the individual's statements with other information in the case record, including reports and observations by other persons concerning the individual's daily activities, behavior, and efforts to work. This includes any observations recorded by SSA employees in interviews and observations recorded by the adjudicator in administrative proceedings.

In this case, there are glaring inconsistencies in Plaintiff's own statements and actions. Plaintiff started physical therapy on April 16, 2002. On May 24, 2002, he said he felt much better than when he first started physical therapy (when he only complained of mild back pain and some leg numbness). The therapist found Plaintiff had improved considerably and recommended

continuation, but Plaintiff never returned, with no explanation. Five days later, he told Dr. Douglas he was having increasing pain "since completing physical therapy." Inexplicably, Plaintiff told Dr. Justo he was a month post-op when he felt something pull in his back while undergoing physical therapy. Plaintiff had not even started physical therapy a month post-op, and never reported pulling something in his back during therapy. In fact, after about five weeks, he said he felt much better. He then told Dr. Douglas he felt much worse since "completing" physical therapy.

On March 4, 2003, approximately a years after his surgery, Dr. Douglas noted Plaintiff's continued complaints of low back pain and intermittent left leg pain, but reported Plaintiff had "much improved," and released him from his care to return on an as-needed basis. There is no record that Plaintiff ever returned to Dr. Douglas.

About a month later, Plaintiff reported to Dr. Justo that he continued to have back and leg pain; that the muscle relaxer caused jerking and the Topamax caused headaches. Dr. Justo prescribed methadone. Nearly two months later, on June 27, 2003, Plaintiff told Dr. Justo the methadone was helping, but caused increased constipation. Increased activity exacerbated his pain. Dr. Justo discontinued the methadone, prescribing a Duragesic patch.

On July 14, 2003, Plaintiff presented to Dr. Dawlah's office for a blood pressure check. He reported a history of back pain for which he was going to pain clinic. He was on a Duragesic patch, and had no particular complaints with his medications, except that "he still had pain with exertion and was unable to walk more than 400 feet at a time." (Emphasis added). He also stated he "was physically active at home and tried to stay active." (Emphasis added). Dr. Dawlah found Plaintiff's back pain "stable."

On December 13, 2003, one year after his date last insured, Plaintiff presented to the emergency room in a depressed state, saying he was in constant pain at a level of 4 out of 10, that the medication made the pain better, and that "working" made it worse. He later told Dr. Justo he believed the Duragesic patch was causing the depression and anxiety and took it off himself. When his back began hurting again due to lack of any medication, he put the patch back on himself, and it was then he ended up in the emergency room with depression.

Dr. Justo discontinued the Duragesic and prescribed MSContin, an opioid. One day later, his dosage was increased. Two weeks later, his dosage was again increased when Plaintiff said he "felt the MSContin was only lasting eight hours," even though he reported pain at only a level 4 out of 10. He then said the MSContin was doing well. In February 2004, Plaintiff was doing well, but "needed to pace his activity so as not to exacerbate pain [and] was able to do some activities of daily living without much discomfort." A July 2004 appointment was apparently his last with Dr. Justo for more than a year.

In October, 2004, Plaintiff told Dr. Smith he had neck pain for one week due to crawling under the house. On December 23, 2004, two years after Plaintiff's date last insured, he told Dr. Smith that he left Dr. Justo because he believed she was over-medicating him giving him too much morphine. He said he was now taking Percocet which was controlling his pain well. Dr. Smith agreed to prescribe the Percocet, but made Plaintiff sign a pain contract. Part of the agreement was that Plaintiff would not call in for medications early. Only one month later, however, Plaintiff reported had been taking an extra ½ Percocet a day for the past two weeks due to his mother's hospitalization. Yet his reported pain level was only 2 out of 10. Three months later, in April, Plaintiff told Dr. Smith he was "doing more in the summer" and the Percocet was starting to wear

off a little early. His pain was now only 3 out of 10, but he said it could go as high as 7, "when he is riding on his riding lawnmower for more than ½ hour." Dr. Smith increased both the Percocet and Flexeril. Four months later, in August, Plaintiff told Dr. Smith the two Percocet a day seemed to help his pain, but the dose was "not working as well as he would like" and he wanted to increase its frequency. He told the doctor he was not taking any extra on his own. Dr. Smith increased the dosage, but said he could not increase it any further. Only about three weeks later, Plaintiff called Dr. Smith's office, saying he was "completely out" of his medications, and that he had told Dr. Smith at the last visit that the medication was not helping and that sometimes he took extra on his own.

Five months later, In January 2006, Plaintiff told Dr. Smith he had seen Dr. Justo again. He told Dr. Smith that Dr. Justo had wanted to put him back on MSContin, but she was leaving the practice and therefore did not want to start him on it. He told Dr. Smith that Dr. Justo had told him to ask him to prescribe the MSContin. Dr. Smith, however, was not comfortable prescribing MSContin, and recommended Plaintiff return to the pain clinic for that. Plaintiff then just asked for ten extra Percocet a month (two a day plus ten extra), which Dr. Smith prescribed.

In June 2006, Plaintiff said he hit his back on a chair and his back had been hurting him since. He was using more Percocet than prescribed. Dr. Smith increased his Percocet to three times a day for the next month. After that month, he was to return to taking two per day.

On August 31, 2006, Dr. Smith gave Plaintiff a prescription for 90 percocets. On September 25 (less than 30 days later), Plaintiff was given a refill of 90 Percocets. On October 20 (again less than 30 days later), Plaintiff again presented for a refill. There is no note that he ever returned to the

pain clinic.

The ALJ noted the two psychological evaluations, both performed at Plaintiff's request, that both resulted in "invalid" MMPI-2 scores. During the first, Plaintiff reported he had a ghost in his house as well as a "guy in a checkered shirt that no one else was able to see." The psychologist excused the "invalid" MMPI-2 score on that occasion, explaining that Plaintiff's "hallucinations," which were consistent with psychosis, would result in similar "invalid" scores. As the ALJ noted, however, Plaintiff underwent another psychological evaluation in October 2005. At this evaluation he did not report seeing any ghosts or men in checkered shirts, yet the psychologist, again retained by Plaintiff, still considered the MMPI-2 profile "invalid." The undersigned finds the ALJ could reasonably interpret these two separate invalid personality tests as evidence of Plaintiff's lack of credibility.

"Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir.1984) (citing Tyler v. Weinberger, 409 F.Supp. 776 (E.D.Va.1976)). Based on all of the above, the undersigned finds substantial evidence supports the ALJ's determination that Plaintiff's complaints about his pain and limitations were not entirely credible.

## F. RFC Determination

Plaintiff's final argument is that there is lack of substantial support for the ALJ's RFC finding. Defendant contends the ALJ properly assessed Plaintiff's Residual Functional Capacity. SSR 96-7p, regarding *Assessment of RFC*, provides that it is the ALJ who is responsible for

43

assessing the claimant's RFC. Here, the ALJ determined that, before his date last insured, Plaintiff had the residual functional capacity to perform the exertional demands of light work, which requires a maximum lifting of 20 pounds and frequent lifting of ten pounds. Additionally, Plaintiff would have the following limitations: he must have the ability to briefly change positions at least every half hour; he can have no exposure to temperature extremes or significant workplace hazards like heights or dangerous machinery; he can do no job requiring more than frequent fine manipulation with either hand; he can do no job requiring overhead reaching; he can do no more than occasional climbing, balancing, stooping, kneeling, crouching or crawling; he can do no fast-paced or assembly line work;[9] he cannot do work consisting of detailed or complex instruction; he cannot have any requirement to make workplace decisions; he can do no job that requires close interaction with coworkers or supervisors, or any contact with the general public; and he must be able to miss up to one day or work per month. Despite these numerous restrictions, the VE testified that there was work in significant numbers at both the light and sedentary exertional levels that the claimant could perform.

Plaintiff argues that the ALJ's finding that he could use hand controls and perform work requiring frequent fine manipulation is reversible error because of his carpal tunnel syndrome. As already found, however, despite Plaintiff's diagnosis of carpal tunnel syndrome one month before

---

[9]Plaintiff states that the ALJ made a finding that Plaintiff could do "fast paced or assembly line work." In Finding No. 5, the ALJ does state: "he can do no more than fast-paced or assembly line work." This finding clearly contains a typographical or scrivener's error. First, the sentence simply makes no sense; second, the actual hypothetical to the VE upon which the ALJ relied, included "no fast paced or assembly line work." (R. 657). The undersigned therefore finds the words "more than" were simply a cut-and-paste error, and the reasonable interpretation of the sentence is "he can do no fast-paced or assembly line work."

his date last insured, there was no evidence of functional limitations due to this impairment before his date last insured.

In fact, the ALJ restricted Plaintiff far more than did the first State agency physician, whose opinion was submitted on December 4, 2002, only weeks before Plaintiff's date last insured. The second State agency physician opined, three months after Plaintiff's date last insured, that he could work at the light exertional level. Dr. Brown, did, however, lower Plaintiff' RFC to sedentary "considering the degree of subjective pain and in view of objective findings." The undersigned has already found, however, that substantial evidence supported the ALJ's determination that Plaintiff's subjective allegations of pain and limitation were not entirely credible. Both State agency physicians found Plaintiff could operate hand or foot controls, could perform all posturals occasionally, and had no manipulative limitations.

Plaintiff argues that Dr. Smith specifically barred leg and arm controls and fine manipulation such as typing. The ALJ, however, accorded Dr. Smith's RFC little weight, in large part because it was completed on November 23, 2005, almost a full three years after Plaintiff's date last insured, and there was no opinion that Plaintiff was so restricted submitted before his date last insured. In fact, Plaintiff did not even begin seeing Dr. Smith until a full two years after his date last insured. The undersigned finds these fact alone substantially support the ALJ's according little weight to Dr. Smith's opinion.

Additionally, however, the undersigned notes that during the year before Dr. Smith completed the RFC form, Plaintiff apparently saw him only four times. All those times Plaintiff reported doing "well," with the exception of requesting additional Percocets, first because his mother

was hospitalized and he had to be on his feet more; second when it was "starting to wear off a little early" as he was "doing more this summer;" and finally when the dosage was simply "not working as well as he would like." During all this time, Plaintiff reported his pain levels at only two or three out of ten (although it could "go as high as seven" when he rode his lawn mower for over a half hour). Further, where Dr. Smith attempted to explain his earlier RFC, he noted that his requirement that Plaintiff must lie or change positions frequently was based on Plaintiff's own statement that he couldn't lie, sit or stand for prolonged periods of time without increased back pain. Although he therefore opined that Plaintiff should be permitted to recline part of the day (just for a change of position), he did not advise him to elevate his feet because that was not necessary. In regard to fine manipulation skills, Dr. Smith explained that although Plaintiff had some loss of grip strength his carpal tunnel syndrome should not be worsened by fine manipulation such as working at a desk or filing papers. Although typing, using a jackhammer, or air gun, or using a screwdriver could aggravate his carpal tunnel symptoms, simple fine manipulation should not, and he "should be able to do this fine manipulation on a daily basis for at least a portion of the day." Only things that would involve intense grasping such as turning a screwdriver or other such manual labor needed to be avoided, according to Dr. Smith.

In response to the ALJ's hypothetical, the VE testified there would be jobs available at the sedentary level, such as general office clerk, with 2900 regionally and 299,000 nationally; and at the light level, such as machine tender, with 3200 regionally and 327,000 nationally. The VE testified that these jobs were only examples of jobs that would exist in significant numbers in the national economy.

Plaintiff's counsel then added further limitations: no repetitive reaching or stretching; no

repetitive gripping or grasping; some fine manipulation affected by numbness in the finger tips and hands; very limited neck motion; no requirement that he look down for long periods or overhead or side too side. The VE testified that these limitations might reduce the number of jobs by 50%. The undersigned notes that even if the ALJ accepted these limitations, which he did not, the number of jobs available at both the light and sedentary levels would still be significant.

When counsel added that the claimant would need unscheduled work breaks for physical and emotional reasons 50% of the time, the VE found there would be no jobs. If the person had only 50% efficiency due to pain, depression, and medication, there would be no jobs. If just ordinary work duties caused such stress that the person may "just have to walk off from what he is doing" approximately half the time, there would be no jobs.

In <u>Koonce v. Apfel</u>, 166 F.3d 1209 (4th Cir 1999), the Court held that an ALJ has "great latitude in posing hypothetical questions" and need only include limitations that are supported by substantial evidence in the record. In <u>Lee v. Sullivan</u>, 945 F.2d 689 (4th Cir. 1991), the Fourth Circuit noted that a requirement introduced by claimant's counsel in a question to the VE "was not sustained by the evidence, and the vocational expert's testimony in response to the question was without support in the record.". The undersigned finds that counsel's limitations were not supported by substantial evidence on or before, or even shortly after his date last insured. Except for Dr. Smith's RFC, submitted three years after the date last insured, and the two psychological evaluations that contained invalid personality tests, there is no evidence that Plaintiff would have needed unscheduled work breaks for physical or emotional reasons 50% of the time; would have been only 50% efficient due to pain, depression and medication; or would have been too stressed by regular work duties that he might "just have to walk off from what he was doing" on or near his date last

insured.

Additionally, the two State agency physicians' RFC's, completed near to the date last insured, both indicated Plaintiff could perform work that included using hand and foot controls, occasional postural movements, and fine manipulation. Although the second State agency physician lowered Plaintiff's RFC to sedentary based, in part, on subjective complaints of pain and fatigue, the undersigned notes that the ALJ asked the VE if there were jobs at the sedentary level with the same limitations and the VE again testified that there would be a significant number of jobs available.

SSR 96-7p provides, in pertinent part:

> Although the administrative law judge and the Appeals Council are responsible for assessing an individual's RFC at their respective levels of administrative review, the administrative law judge or Appeals Council must consider and evaluate any assessment of the individual's RFC by a State agency medical or psychological consultant and by other program physicians or psychologists. At the administrative law judge and Appeals Council levels, RFC assessments by State agency medical or psychological consultants or other program physicians or psychologists are to be considered and addressed in the decision as medical opinions from nonexamining sources about what the individual can still do despite his or her impairment(s).

Here, the ALJ did consider the RFC's from the State agency physicians. He even added additional limitations to those found by those physicians. The additional limitations added to the hypothetical by Plaintiff's counsel are not supported by substantial evidence. The undersigned therefore finds substantial evidence supports the ALJ's RFC, his hypotheticals to the VE, and his reliance on the testimony of the VE in response to those hypotheticals.

Upon consideration of all of the above, the undersigned finds substantial evidence supports the ALJ's determination that Plaintiff was not disabled on or before his date last insured, December 31, 2002.

## V. RECOMMENDED DECISION

For the reasons above stated, the undersigned recommends Defendant's Motion for Summary Judgment [Docket Entry 17] be **GRANTED**, Plaintiff's Motion for Summary Judgment [Docket Entry 14] be **DENIED**, and this matter be **DISMISSED** from the Court's Docket.

Any party may, within ten days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the Honorable Frederick P. Stamp, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to transmit a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _4_ day of August, 2009.


JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE

49